

January 29, 2023

*Via ECF*

Mr. Michael E. Gans
Clerk of Court
United States Court of Appeals
 For the Eighth Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street, Room 24.329
St. Louis, MO 63102

   Re: *United States v. Haitao Xiang*, No. 22-1801
      (Arg. & Sub. – Jan. 12, 2023—Smith, Wollman,
      and Loken)

Dear Mr. Gans,

  Dr. Xiang submits this letter under Federal Rule of Appellate Procedure 28(j) to provide notice of the recent opinion in *United States v. Lauren Carpenter*, No. 20-CR-376, Doc. 198, 2023 WL 358794 (N.D. Ill. Jan. 23, 2023) (slip opinion) which found that the border search exception did not apply to a digital device search. This opinion supports Dr. Xiang's argument on pages 28-42 of his opening brief and pages 4-20 of his reply brief. The opinion is attached to this letter.

  In short, *Carpenter* found that the border search exception did not apply to a digital device search for evidence of a crime because it "would stretch [the exception] beyond its purposes." *Carpenter*, 2023 WL 358794, at *1. It rejected a search that paralleled the one conducted here. In *Carpenter*, as part of its investigation into device access fraud, Homeland Security agents coordinated with Customs Border Protection agents to seize the defendant's cellphone when she crossed the border. *Id*. at *1-2. As here, the CBP agents immediately gave the device to the investigators after they seized it. *Id*.

  This, however, was not a valid border search because it was not conducted for a traditional border search purpose. *Id*. at *3-5. While the government's interest was at its zenith,

searching for evidence of a domestic crime "had no grounding in the special needs underlying the border-search exception[.]" *Id.* In this way, the device search did not "further a sovereign interest underlying the exception" because the search's purpose was to investigate a domestic crime. *Id.* at *4-5. This was true even though the devices contained images of stolen mail and credit cards—*i.e.*, "digital contraband" according to the government. *Id.* at *5.

Put simply, "[a]pplying the exception" in this similar situation "would encourage law enforcement to skirt the warrant requirement whenever" a suspect crossed the border. *Id.* at *4. But border searches cannot be done "with the sole aim" of gathering evidence of general crime. *Id.* at *3. To hold otherwise would "'untether' the exception from its purposes." *Id.*

Sincerely,

s/ Matthew P. Kralovec
*Counsel for Haitao Xiang*

cc:    all counsel (via ECF)

2023 WL 358794
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

UNITED STATES OF AMERICA, Plaintiff,

v.

LAUREN CARPENTER, Defendant.

No. 20 CR 376-2
|
Filed: 01/23/2023

## MEMORANDUM OPINION AND ORDER

Virginia M. Kendall United States District Judge

**\*1** When Defendant Lauren Carpenter arrived at Midway Airport on November 3, 2019, returning from a trip to Jamaica, Customs and Border Patrol stopped her. Then, Homeland Security Investigations special agents scrolled through her cell phone—looking for evidence of postal theft. After finding incriminating evidence, the agents downloaded a copy of the phone's contents. The agents had planned to search Carpenter's phone before she arrived, but they did not secure a warrant. Facing charges of conspiracy to commit mail theft and access device fraud, in violation of 18 U.S.C. § 371, and mail theft, in violation of 18 U.S.C. § 1708, (Dkt. 55 at 1–6), Carpenter moved to suppress the evidence resulting from the warrantless searches of her phone. (Dkt. 140). Although the border-search exception to the Fourth Amendment permits warrantless searches at the border, Carpenter argues that the exception does not apply to searches for evidence of domestic crime. The Court agrees: applying the border-search exception here would stretch it beyond its purposes. For the following reasons, Carpenter's motion to suppress is granted.

### BACKGROUND

The following facts are undisputed.[1] As Carpenter and her then-boyfriend, codefendant Stephon Johnson, returned to Midway Airport from Jamaica on November 3, 2019, Customs and Border Patrol (CBP) agents pulled the couple aside for additional screening. (Dkt. 140 at 1–2). Carpenter and Johnson were suspects in an ongoing postal-theft investigation by the USPS Office of Inspector General (OIG), the USPS Inspection Service (USPIS), and Homeland Security Investigations (HSI). (*Id.*; Dkt. 145 at 2). Before the couple left for Jamaica, investigators flagged Johnson for heightened screening at the airport upon his return. (Dkt. 140 at 1–2; Dkt. 140-2; Dkt. 145-3 at 8).[2]

Johnson was an early target of the investigation: pursuant to warrants, law enforcement searched Johnson's and codefendant Davey Hines's Snapchat accounts in May and June 2019, finding that Johnson had "regularly exchanged images of stolen mail associated with financial instruments and [personal identifying information] belonging to other people." (Dkt. 145 at 3; Dkt. 145-1). After obtaining a Title III order on September 13, 2019, law enforcement "intercepted messages and images depicting stolen mail, stolen financial instruments, and victim [personal identifying information] through Johnson's Snapchat account"—including "an image of mail from zip code 60619." (Dkt. 145 at 3–4; Dkt. 145-1). Although OIG had connected Carpenter to an August 2019 complaint by a USPS customer involving stolen mail in the 60619 zip code,[3] she became a target later, after HSI agents learned that she was traveling with Johnson, lived with him, and worked as a USPS mail carrier. (Dkt. 145 at 4–5; Dkt. 145-2; Dkt. 145-3).

**\*2** At Midway, CBP officers searched Carpenter's and Johnson's belongings. (Dkt. 140 at 2; Dkt. 145 at 5). Then, HSI Special Agents Eric Bonza and Kevin Gerlock manually searched the couple's cell phones. (Dkt. 140 at 2; Dkt. 145 at 5–6).[4] The agents put the phones in Airplane mode before the search to prevent the phones from sending or receiving data, and during the search, did not download files, de-encrypt data, or recover deleted files. (Dkt. 145 at 6). The manual search of Carpenter's phone revealed "images of credit cards in other peoples' names" and "images of mail addressed to other people"—including mail and credit cards belonging to residents of the 60619 zip code. (Dkt. 140 at 2; 140-5 at 3; Dkt. 145 at 6). There were similar images on Johnson's phone. (Dkt. 140 at 2; Dkt. 140-5 at 3; Dkt. 145 at 7).

Before returning the cell phones, the HSI agents downloaded copies of the phones' contents using Cellebrite, which allowed them to extract data without altering it or disrupting the phones' function. (Dkt. 140 at 2–3; Dkt. 140-5 at 3; Dkt. 145 at 8). Later, a forensic search of the downloaded copies of Carpenter's and Johnson's phones uncovered communications between Carpenter and Johnson: they discussed stealing mail containing credit cards and opening credit cards in others' names, and they exchanged images of others' credit

cards and passcodes. (Dkt. 145 at 8–9; Dkt. 1 ¶ 16). The forensic search further revealed communications in which codefendant Kyshalah Powell sent Carpenter images of others' credit cards and Carpenter told Powell to steal mail. (Dkt. 145 at 9; Dkt. 1 ¶¶ 36–37). Agents also found conversations between Johnson and Powell about stolen mail. (Dkt. 145 at 9; Dkt. 1 ¶ 40).

OIG and USPIS agents interviewed Carpenter on June 22, 2022. (Dkt. 145 at 9). After Carpenter waived her *Miranda* and *Garrity* rights, law enforcement confronted her with images of others' mail found on her phone. (*Id.*; Dkt. 140-7 at 1). Carpenter admitted that she had stolen mail containing credit cards and helped Johnson apply for credit accounts in others' names. (Dkt. 145 at 9; Dkt. 140-7 at 2). Law enforcement interviewed Powell on the same day. (Dkt. 145 at 9–10; 140-12 at 1–3). After seeing evidence from Carpenter's phone, Powell admitted to stealing mail at Carpenter's direction. (Dkt. 145 at 9–10; 140-12 at 1–3). Powell then consented to a search of her cell phone. (Dkt. 140 at 20 n.5; Dkt. 140-12 at 6).

Law enforcement arrested Carpenter and her codefendants on July 22, 2020. (Dkt. 145 at 10). Law enforcement also obtained a warrant to search Carpenter's phone, relying on the records from the complaint to OIG by a USPS customer on Carpenter's mail route and images and communications from Carpenter's and Johnson's phones. (Dkt. 140 at 3; Dkt. 140-8 ¶¶ 11–15; Dkt. 145 at 10). A grand jury indicted Carpenter on August 11, 2020, charging her with conspiracy to commit mail theft and access device fraud, in violation of 18 U.S.C. § 371, and mail theft, in violation of 18 U.S.C. § 1708. (Dkt. 140 at 4–5; Dkt. 145 at 10; Dkt. 55 at 1–6).

Carpenter moved to suppress the evidence from her cell phone and the fruits of that evidence. (Dkt. 140). In response, the Government contends that the search was lawful under the border-search exception to the Fourth Amendment. (Dkt. 145).

## DISCUSSION

Carpenter argues: (1) that the border-search exception to the Fourth Amendment does not permit warrantless cell phone searches for evidence of domestic crime; (2) that even if the manual search of her cell phone fell within the border-search exception, the warrantless forensic search went too far; and (3) that suppression is appropriate for the evidentiary fruits that resulted from searching her phone. (Dkt. 140 at 6, 10, 14). The Government responds that the searches were lawful under the border-search exception and falls back on exceptions to the exclusionary rule. (Dkt. 145 at 11, 19–21). The Court holds that the border-search exception does not apply and suppression is appropriate.

### I. The Border-Search Exception

**\*3** The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). There is an exception for searches at the borders,[5] where the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith." *United States v. Wanjiku*, 919 F.3d 472, 480 (7th Cir. 2019) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004)).[6] The border-search exception permits "routine searches and seizures at the border, without probable cause or a warrant." *Flores-Montano*, 541 U.S. at 153 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)); *see also United States v. Ramsey*, 431 U.S. 606, 616 (1977). The border-search exception serves "two main purposes: to allow the regulation of the collection of duties, and 'to prevent the introduction of contraband into this country.' " *Wanjiku*, 919 F.3d at 480 (quoting *Montoya de Hernandez*, 473 U.S. at 537); *see also United States v. 12 200-Foot Reels of Super 8mm Film*, 413 U.S. 123, 125 (1973).

Routine border searches for contraband require no suspicion. *Flores-Montano*, 541 U.S. at 155. And there is growing consensus that manual border searches of cell phones are routine. *Alasaad v. Mayorkas*, 988 F.3d 8, 13 (1st Cir. 2021); *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018). Here, the Government concedes that Special Agents Bonza and Gerlock were investigating domestic crime when they searched Carpenter's cell phone. Nonetheless, the Government maintains the searches fall within the exception because: (1) there is a reduced expectation of privacy at the border; and (2) irrespective of the agents' motivations, the incriminating images on Carpenter's phone were digital

Appellate Case: 22-1801    Page: 4    Date Filed: 01/29/2023 Entry ID: 5240145

contraband. The question then before this Court is whether the border-search exception applies when agents search for evidence of domestic crime. It does not.

Applying the border-search exception to searches with the sole aim of investigating domestic crime would "untether" the exception from its purposes. *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (quoting *Riley*, 573 U.S. at 386); see *Riley*, 573 U.S. at 383, 386–87, 389–91 (holding that permitting warrantless cell phone searches would "untether" the search-incident-to-arrest exception from its rationales of protecting officer safety and preventing evidence destruction (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009))); *Collins v. Virginia*, 138 S. Ct. 1663, 1671–72 (2018) (refusing to expand the automobile exception to permit warrantless intrusion into a home or curtilage, which would "untether" the exception from its justifications).

**\*4** Even a routine border search must further a sovereign interest underlying the exception whether by preventing the entry of people or contraband, investigating cross-border crime, collecting or regulating duties, or otherwise safeguarding national security. See *Aigbekaen*, 943 F.3d at 721; *cf. Wanjiku*, 919 F.3d at 488–89 (search for evidence of cross-border criminal activity revealing child pornography); *United States v. Skaggs*, 25 F.4th 494, 500 (7th Cir. 2022) (same). The searches of Carpenter's cell phone furthered only the Government's general interest in domestic crime control. Applying the exception here would encourage law enforcement to skirt the warrant requirement whenever a suspect in a domestic criminal investigation leaves the country.

The Fourth and Ninth Circuits have reached similar conclusions. In *United States v. Cano*, the Ninth Circuit held "that the border search exception authorizes warrantless searches of a cell phone only to determine whether the phone contains contraband." 934 F.3d at 1018. And the Fourth Circuit concluded in *United States v. Aigbekaen* that a border search must have some "nexus to the recognized historic rationales justifying the border search exception." *Aigbekaen*, 943 F.3d at 721. There, the HSI agents' suspicions that the defendant "had previously committed grave *domestic* crimes ... were entirely unmoored from the Government's sovereign interests in protecting national security, collecting or regulating duties, blocking [the defendant's] own entry, or excluding contraband." *Id.*

The Court's holding is also consistent with the First Circuit's broader understanding of the border-search exception's scope. In *Alasaad v. Mayorkas*, the First Circuit concluded that the exception applies to searches "for contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE." *Alasaad*, 988 F.3d at 21. The First Circuit relied on the Supreme Court's explanation of the Government's heightened interest in protecting the borders against the entry of "*anything* harmful," including "communicable diseases, narcotics, or explosives." *Id.* at 20 (quoting *Montoya de Hernandez*, 473 U.S. at 544). Further, "Congress is better situated than the judiciary to identify the harms that threaten us at the border." *Id.* These are compelling points. Yet, *Alasaad* does not suggest that the border-search exception should apply to a targeted search for evidence by HSI agents investigating domestic criminal activity. See *id.* at 21. Indeed, the Court is not aware of any decisions relying on the border-search exception to justify warrantless searches for evidence of domestic crime.

The Government argues that the border-search exception should apply to searches for evidence of domestic crime because the "exception is founded in a reduced expectation of privacy at the border." (Dkt. 145 at 15). For support, it leans on the Supreme Court's statement that border searches, "pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152–53. But the Government emphasizes the final clause at the expense of the preceding qualifier. See *Wanjiku*, 919 F.3d at 480 (explaining that the Supreme Court has tied the border-search exception to the purposes of regulating the collection of duties and preventing the entry of contraband). The reasonableness of border searches depends on the Government's heightened "interest in preventing the entry of unwanted persons and effects." *Wanjiku*, 919 F.3d at 480 (quoting *Flores-Montano*, 541 U.S. at 152). By contrast, when law enforcement acts pursuant to its general interest in investigating domestic crime—even at the border—warrantless cell phone searches are less reasonable.

**\*5** Further, "[w]hile reasonableness under the Fourth Amendment is predominantly an objective inquiry" under *Whren v. United States*, 517 U.S. 806 (1996), "purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue." *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000). Indeed, *Whren* "expressly distinguished cases where [the Supreme Court] had addressed the validity of searches conducted in the absence of probable cause." *Edmond*, 531 U.S. at 45; *Whren*, 517 U.S. at 811–12 ("[T]he exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes."); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011) (explaining that in "special-needs and administrative-search cases, ... 'actual motivations' do matter" (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001))).

Inquiring into motives is permissible where exceptions to the Fourth Amendment's probable-cause and reasonable-suspicion requirements depend on heightened governmental interests. For example, the Supreme Court held in *City of Indianapolis v. Edmond* that checkpoints to search vehicles for illegal narcotics were unconstitutional because the "primary purpose" of the checkpoint program was "ultimately indistinguishable from the general interest in crime control." *Edmond*, 531 U.S. at 44. And in *United States v. Martinez-Fuerte*, the Court approved suspicionless searches at immigration checkpoints near the border because those checkpoints were designed to intercept undocumented noncitizens—a special need. 428 U.S. 543, 561–64 (1976); *Montoya de Hernandez*, 473 U.S. at 538 (explaining that *Martinez-Fuerte* and similar cases "reflect the longstanding concern for the protection of the integrity of the border").

Certainly, the Government's interest in protecting the border presents "special needs, beyond the normal need for law enforcement," which justify border searches. *See Ashcroft*, 563 U.S. at 736; *Martinez-Fuerte*, 428 U.S. 543, 561–64. Inquiring into the purpose behind the searches is therefore appropriate to determine whether the border-search exception applies. Since the Government's purpose in searching Carpenter's cell phone had no grounding in the special needs underlying the border-search exception, the exception does not apply.

The Government argues in the alternative that the border-search exception should apply because images of stolen mail and credit cards are digital contraband—rather than evidence of domestic crime. (Dkt. 145 at 17). But if the images were contraband, Special Agents Bonza and Gerlock would have seized the phone or removed the images from the phone after downloading its contents. *See, e.g.*, *Skaggs*, 25 F.4th at 496 (noting that thumb drives containing suspected child pornography were seized). After discovering the incriminating images on Carpenter's cell phone, the agents allowed Carpenter to bring her phone and the images into the country. Recall that a purpose of the border-search exception is "to *prevent* the introduction of contraband into this country"—not to *discover* contraband and then allow it past the border. *Wanjiku*, 919 F.3d at 480 (emphasis added) (quoting *Montoya de Hernandez*, 473 U.S. at 537); *cf. Cano*, 934 F.3d at 1014 (ruling that child pornography is digital contraband because "the United States has a strong interest in preventing the entry of such material"); *Touset*, 890 F.3d at 1235–36 (similar).

In sum, Special Agents Bonza and Gerlock manually and forensically searched Carpenter's cell phone for evidence of domestic crime—not for any purpose underlying the border-search exception. Therefore, the exception does not apply. Both searches violated the Fourth Amendment.

**II. Suppression of Evidence**

**\*6** When law enforcement violates the Fourth Amendment in obtaining evidence, "the remedy is generally the exclusion of that evidence—and evidence that is the fruit of the illegal search or seizure." *United States v. McGill*, 8 F.4th 617, 624 (7th Cir. 2021) (citing *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016)). Carpenter requests the suppression of the evidence found on her cell phone and the fruits of the unlawful searches, specifically: (1) her statements during her interrogation; (2) Powell's statements and testimony; and (3) evidence from the post-arrest search of Carpenter's cell phone. (Dkt. 140 at 14). In response, the Government invokes the good-faith exception to the exclusionary rule, the inevitable-discovery doctrine, and the attenuation doctrine. (Dkt. 145 at 19–22).

**A. Good Faith**

"Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 241 (2011). The phrase "*binding* precedent" is key. *United States v. Berrios*, 990 F.3d 528, 532 (7th Cir. 2021). This requirement distinguishes between established and unsettled law—since the exclusionary rule applies all the same to "mistaken efforts to *extend* controlling precedents." *Id.* (quoting *United States v. Jenkins*, 850 F.3d 912, 920 (7th Cir. 2017)). The Seventh Circuit upheld the application of the good-faith exception in *United States v. Wanjiku* and *United States v. Skaggs*—both cases involving border searches of electronic devices for child pornography. *Wanjiku*, 919 F.3d at 485–86; *Skaggs*, 25 F.4th at 499–500. At the time of those searches, "the Supreme Court required no particularized suspicion for a non-destructive border search of property, and, at most, reasonable suspicion for a highly intrusive border search." *Wanjiku*, 919 F.3d at 485.

But the Government does not point to any binding precedent that authorized border searches for evidence of domestic crime at the time of the searches at issue. Rather, in declining to resolve "what level of suspicion is required (if any) for searches of electronic devices at the border," *Wanjiku*, 919 F.3d at 489, the Seventh Circuit had declared the issue unsettled. At best, the searches of Carpenter's cell phone were an "effort to extend" the Seventh Circuit's opinions on the border-search exception. *See Berrios*, 990 F.3d 528, 532.

The Government further contends that the searching agents relied on 19 U.S.C. § 482 and 19 C.F.R. § 162.6,[7] which, it says, "authorize warrantless searches without respect to the nature of the crime under investigation." (Dkt. 145 at 20). The Seventh Circuit has acknowledged that Section 482 is a source of statutory authority for border searches. *Wanjiku*, 919 F.3d at 480. Yet neither the statute nor the regulation provide shelter for the unlawful searches of Carpenter's cell phone. Section 482 gives customs agents authority to search "individuals ... with reasonable cause to believe that the suspect has items that were imported into the country 'contrary to law.' " *Yang*, 286 F.3d at 946 n.2 (quoting 19 U.S.C. § 482) (explaining further that the statute's "phrase 'wherever found' is not infinite in scope but has been interpreted to be limited by Fourth Amendment reasonableness constraints" (citing *United States v. Bilir*, 592 F.2d 735, 739 n.6 (4th Cir. 1979))); *see also Cano*, 934 F.3d at 1017 (explaining that Section 482 does not grant border officials "general authority to search for crime," and "there is no law prohibiting the importation of mere evidence of crime").[8] Since the key to the good-faith inquiry is binding precedent, reliance on a questionable reading of a statute—without support from a binding interpretation by the Supreme Court or Seventh Circuit—is unavailing.

**\*7** Special Agents Bonza and Gerlock were investigating domestic crime—not acting as customs agents. *See Cano*, 934 F.3d at 1013 (interpreting Section 482 as not authorizing searches by "general law enforcement officers"). In fact, the agents required special access to the CBP area to search Carpenter's cell phone. Moreover, Section 482's language authorizing searches for merchandise imported "contrary to law" should be interpreted according to "Fourth Amendment reasonableness constraints." *See Yang*, 286 F.3d at 946 n.2; 19 U.S.C. § 482(a). Even if this language could be literally construed to authorize a search for evidence of domestic crime, such a reading would be unreasonable. Moreover, the Government has not shown that its understanding of Section 482 was established law at the time of the searches.

As for the Government's argument that the agents relied on 19 C.F.R. § 162.6, it points to no authority for the position that investigators can rely in good faith on an executive agency's regulation. Executive agencies cannot use regulation to shield evidence gathered from unconstitutional searches against suppression. Thus, the good-faith exception to the exclusionary rule does not apply.

**B. Inevitable Discovery**

Alternatively, the Government argues that suppression is inappropriate because the discovery of the evidence resulting from the unlawful searches was inevitable. (Dkt. 145 at 21; Dkt. 186 at 2–3). The Government's response to Carpenter's motion to suppress and its post-hearing brief cite only one case, *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004), which contradicts the Government's position. (Dkt. 145 at 21; Dkt. 186 at 3). The Government declined the opportunity to present witnesses at the suppression hearing and otherwise supports its inevitable-discovery argument with conclusory allegations. (*See* Dkt. 145 at 21; Dkt. 186 at 2–3). Since the Government has failed to develop this argument, it is waived. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005).

The Government's argument also fails on the merits. Under the doctrine of inevitable discovery, "illegally seized evidence need not be suppressed if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means." *McGill*, 8 F.4th at 624 (quoting *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012)). The Government must show, first, "that it had or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence," and second, "that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009). To satisfy the second prong, the Government must show that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id.* at 640.

The Government argues that it could have relied on evidence from the initial manual search of Carpenter's phone to obtain a warrant. (Dkt. 145 at 21). This argument fails: as the Court determined above, the manual search of Carpenter's cell phone was unlawful. *See McGill*, 8 F.4th at 624. The Government further contends that since investigators found the same communications on Johnson's cell phone as on Carpenter's, law enforcement would have used the evidence from Johnson's phone to obtain a warrant to search Carpenter's phone. (Dkt. 145 at 21). *Johnson*—named after a different Johnson—forecloses the argument. *See Johnson*, 380 F.3d at 1015–16 (holding that suppression is appropriate where "an illegal search of other people would have turned up the evidence illegally seized from" the defendant). Since the warrantless searches of Johnson's phone aimed to reveal evidence of domestic crime, those searches violated the Fourth Amendment for the same reasons that the searches of Carpenter's phone did.

**\*8** Next, the Government argues that the evidence resulting from the search and interception of Johnson's Snapchat account, pursuant to a warrant and Title III order, offered "a lawful basis to search Johnson's phone" before the search at Midway Airport on November 3, 2019. (Dkt. 186 at 2–3). Even assuming this assertion satisfies the first prong under *Marrocco*, the Government falls short on the second prong. *See Marrocco*, 578 F.3d at 637–38. The affidavit in support of the Title III application suggests that investigators doubted whether a search warrant for Johnson's phone would be fruitful. (Dkt. 146 at 64–69). Since investigators believed the suspects were relying on Snapchat, and "messages on Snapchat disappear," the affidavit stated that "search warrant results do not reveal the full scope of the communications." (*Id.* at 65, 68).

Further, the affidavit expressed concerns that executing search warrants could "compromise the investigation by alerting the [suspects] to the investigation and allowing unidentified subjects of the conspiracy to further isolate themselves from detection." (*Id.* at 68). "The ability to quickly identify co-conspirators is key to limiting further victimization," the affidavit explained, since the scheme would likely continue after Johnson's arrest. (*Id.* at 66). Considering the affidavit's concerns, concluding that law enforcement would have failed to seek a warrant for Johnson's phone and for Carpenter's phone would not be "unreasonable." *See Marrocco*, 578 F.3d at 640. The Government has therefore failed to carry its burden in its inevitable-discovery argument.

### C. Attenuation

In addition to the evidence found on her cell phone, Carpenter requests the suppression of the fruits of the unlawful searches —specifically: (1) her statements during her interrogation; (2) Powell's statements and testimony; and (3) evidence from the post-arrest search of Carpenter's cell phone. (Dkt. 140 at 14). The Government argues that the fruits resulting from the searches are too attenuated because law enforcement could have confronted Carpenter and Powell with incriminating evidence from Johnson's cell phone instead of relying on the illegal searches of Carpenter's phone. (Dkt. 145 at 22).

Under the attenuation doctrine, the Government bears the burden of identifying "the point at which the government began obtaining evidence 'by means sufficiently distinguishable to be purged of the primary taint.' " *United States v. Conrad*, 673 F.3d 728, 732–33 (7th Cir. 2012) (quoting *Brown v. Illinois*, 422 U.S. 590, 609, 640 (1975)); *Strieff*, 579 U.S. at 232 (explaining that evidence is "admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." (citing *Hudson v. Michigan*, 547 U.S. 586, 593 (2006))). The Court tests each challenged fruit for poison.

*1. Carpenter's Statements in Interrogation*

Carpenter's statements during her interrogation are fruits of the poisonous tree. To decide whether a voluntary confession is free of an unlawful taint, the Court weighs three factors: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Conrad*, 673 F.3d at 733 (quoting *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999)).

First, the temporal-proximity factor favors the Government. "[T]his factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 579 U.S. at 239 (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)). Although "there is no 'bright-line' test," *Conrad*, 673 F.3d at 733 (quoting *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003)), almost eight months passed between the search at Midway Airport and Carpenter's interrogation, which is substantial. *See, e.g.*, *United States v. Davis*, 44 F.4th 685, 689 (7th Cir. 2022) ("Forty-five minutes is more than sufficient time to support attenuation."). Yet, "to draw any conclusions from [the] timing," the Court "must consider the temporal proximity factor in conjunction with the presence of intervening circumstances." *Reed*, 349 F.3d at 464 (citing *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990)).

**\*9** The second factor—whether any intervening circumstances have "sever[ed] the causal connection between [the violation] and the discovery of the evidence"—favors Carpenter. *See Conrad*, 673 F.3d at 734 (quoting *Reed*, 349 F.3d at 464). The only intervening circumstance the Government points to is the search of Johnson's cell phone, which revealed similar evidence. (Dkt. 145 at 22). Yet, the search of Johnson's phone did not "sever the causal connection": it was unlawful for the same reasons as the search of Carpenter's phone. *See Conrad*, 673 F.3d at 734; *see also Johnson*, 380 F.3d at 1015–16 (suppressing evidence from an illegal search of the defendant where law enforcement obtained the same evidence from an illegal search of another person). Although Carpenter received *Miranda* and *Garrity* warnings, indicating her confession was voluntary, such warnings are "never alone sufficient to establish attenuation." *Conrad*, 673 F.3d at 734 (citing *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)).

The third factor is the purpose and flagrancy of the official misconduct, which also favors Carpenter. This factor is the "most important" because the exclusionary rule aims to deter police misconduct. *Davis*, 44 F.4th at 689 (quoting *Conrad*, 673 F.3d at 735); *see also McDaniel v. Polley*, 847 F.3d 887, 896 (7th Cir. 2017) ("When an officer's conduct is negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and strongly favors admissibility." (citing *Strieff*, 579 U.S. at 241)). Actions in bad faith or "undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence" weigh against attenuation. *Conrad*, 673 F.3d at 735–36 (citing *United States v. Carter*, 573 F.3d 418, 425–26 (7th Cir. 2009), and quoting *Reed*, 349 F.3d at 465).

Here, Special Agents Bonza and Gerlock searched Carpenter's cell phone "to advance the investigation." *Conrad*, 673 F.3d at 735–36. They did so at the airport to avoid the warrant requirement. Further, Carpenter became a search target only after investigators learned she was traveling with Johnson, suggesting that the searches of her phone were "a fishing expedition." *See Conrad*, 673 F.3d at 735–36. Law enforcement later confronted Carpenter with the evidence from her phone to elicit a confession. The agents' misconduct was a purposeful attempt to stretch the limits of the border-search exception—the sort of misconduct the exclusionary rule should deter.

On balance, the factors weigh against Carpenter's confession being attenuated from the unlawful searches. Although a significant length of time passed between the initial search and the confession, the lack of intervening circumstances and the purposeful misconduct—which are heavier factors—lean toward suppression. The Government has failed to show that the confession was "purged of the primary taint." *Conrad*, 673 F.3d 728, 732–33 (quoting *Brown*, 422 U.S. at 599). Accordingly, Carpenter's statements during her interrogation must be suppressed.

*2. Powell's Statements and Testimony*

Powell's statements and testimony are also poisonous fruits. To determine whether a witness is attenuated from an unlawful search, the Court consider five factors: (1) whether the witness gave testimony as "an act of free will or coercion" or due to the influence of official authority resulting from the initial unlawful search; (2) "whether the illegality was used in questioning the witness"; (3) the time between the unlawful search and law enforcement's contact with the witness and between the contact and the witness's testimony; (4) whether law enforcement knew the witness's identity before the unlawful search; and (5) whether the unlawful search intended to find "a witness to testify against the defendant." *Ienco*, 182 F.3d at 530 (citing *United States v. Ceccolini*, 435 U.S. 268, 276, 279–80 (1978)).

**\*10** First, in Carpenter's favor, Powell's statements to law enforcement were not "an act of free will." *See Ienco*, 182 F.3d at 530. This factor requires consideration of "the time, place and manner of the initial questioning of" Powell to determine whether her "statements are truly the product of detached reflection and a desire to be cooperative." *Id.* (quoting *Ceccolini*, 435 U.S. at 277). Powell did not approach law enforcement. Rather, in Powell's initial questioning, law enforcement began by confronting her with evidence from the unlawful searches of Carpenter's cell phone, which incriminated Powell. Only then did Powell admit to stealing mail at Carpenter's direction. Nothing suggests that Powell detachedly reflected before making any statements to law enforcement.

Second, "illegality was used in questioning" Powell, which favors Carpenter. *See Ienco*, 182 F.3d at 530. As explained, Powell's interrogation began with law enforcement showing her evidence from the unlawful searches. The Government has failed to suggest that Powell's statements were not tainted by her confrontation with incriminating evidence. Third, in the Government's favor, almost eight months passed between the unlawful searches at Midway Airport and law enforcement's contact with Powell. *See id.* at 531 (noting that four months is "significant"). Yet, the record does not indicate whether law enforcement made any contact with Powell before her interrogation, and it is unclear how much time passed between the contact and her initial statement. (*See* Dkt. 140-12).

Fourth, favoring Carpenter, the Government has not shown that law enforcement could have discovered Powell's identity absent the unlawful searches. *See Ienco*, 182 F.3d at 531. Rather, the unlawful searches of Carpenter's and Johnson's cell phones prompted the investigation into Powell. Fifth, also favoring Carpenter, law enforcement appears to have unlawfully searched Carpenter's phone "with the intention of finding a witness to testify against" her. *See Ienco*, 182 F.3d at 530. The Government does not suggest that the unlawful searches had any other purpose than to uncover evidence against Carpenter and Johnson. After discovering incriminating communications involving Powell, law enforcement began its interrogation of Powell by confronting her with those communications—prompting her incriminating statements.

In sum, four of the five factors weigh toward suppression. Since the Government has failed to establish that Powell's statements and testimony were "purged of the primary taint," *Conrad*, 673 F.3d 728, 732–33 (quoting *Brown*, 422 U.S. at 599), suppression is appropriate.

Carpenter further urges suppression of evidence from Powell's cell phone, since Powell's consent to the search of her phone was tainted for the same reasons as her statements and testimony. (Dkt. 140 at 20 n.5). Powell consented to the search after law enforcement had confronted her with evidence from the unlawful searches. As with Powell's statements and testimony, the Government has not shown that the taint was purged from Powell's consent to the cell phone search. *See Conrad*, 673 F.3d at 732–33. Accordingly, any evidence from the search of Powell's cell phone must be suppressed.

*3. Evidence from the Post-Arrest Search of Carpenter's Cell Phone*

Carpenter argues that the evidence from the later search of Carpenter's cell phone pursuant to a search warrant is also a poisonous fruit. (Dkt. 140 at 18–19). She anticipates a potential argument under the independent-source doctrine. (*Id.*); *United States v. Bell*, 925 F.3d 362, 370 (7th Cir. 2019) ("[W]hen a search warrant is obtained, in part, with tainted information, we ask two questions. First, would the warrant have been issued without considering the tainted information? And, second, was the officer's decision to seek the warrant

prompted by the illegal search?" (citing *United States v. Etchin*, 614 F.3d 726, 737 (7th Cir. 2010))).

**\*11** Carpenter argues, first, that the search warrant for Carpenter's cell phone would not have issued absent the tainted information since only one paragraph in the warrant application did not rely on information from the prior unlawful searches. (Dkt. 140 at 18–19). Second, she argues that law enforcement would not have sought a search warrant for Carpenter's phone had it not already found incriminating evidence on her phone. (Dkt. 140 at 19). The Government does not respond directly to this argument. (Dkt. 145 at 19–22). Instead, the Government appears to stand on its inevitable-discovery argument, which, the Court determined above, is waived. The Government has therefore failed to show that the search warrant for Carpenter's cell phone was untainted. Thus, evidence resulting from the post-arrest search of Carpenter's cell phone pursuant to a warrant must be suppressed.

## CONCLUSION

For the reasons above, Carpenter's motion to suppress is granted.

**All Citations**

Slip Copy, 2023 WL 358794

## Footnotes

1  The Court heard oral argument in a suppression hearing on November 17, 2022, in which the parties did not present additional evidence. (Dkt. 185).

2  Investigators flagged Johnson for heightened screening on September 30, 2019. (Dkt. 140-2; 140-3 at 3). An October 29, 2019 email by an HSI agent suggested that since Johnson was "traveling internationally," HSI could "conduct a boarder [sic] search on his cell phone upon his return." (Dkt. 145-3 at 8).

3  On August 16, 2019, OIG received a complaint from a USPS customer in the 60619 zip code whose credit card had never arrived and had been used for fraudulent purchases. (Dkt. 145 at 4; Dkt. 145-4 at 3). OIG agents determined that Carpenter was the mail carrier who should have delivered the credit card but did not pursue the incident further. (Dkt. 145 at 4; Dkt. 145-4 at 3).

4  Ahead of Carpenter's and Johnson's arrival at Midway, Special Agent Bonza coordinated with CBP to gain access to the CBP area, where the secondary inspection occurred, since he and Special Agent Gerlock did not have the necessary badges. (Dkt. 145-3).

5  For passengers arriving on international flights, the customs area of Midway Airport functions as an international border. *See United States v. Wanjiku*, 919 F.3d 472, 479–80 (7th Cir. 2019) (citing *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002)).

6  The Government's heightened authority to conduct border searches has statutory grounding. *See Wanjiku*, 919 F.3d at 479–80 (citing 19 U.S.C. §§ 482, 1467, 1496, 1581, 1582). The Government relies specifically on 19 U.S.C. § 482, which provides, in relevant part, that "[a]ny of the officers or persons authorized to board or search vessels may stop, search, and examine ... any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law." 19 U.S.C. § 482(a); (Dkt. 145 at 20).

7   Section 162.6 states that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer." 19 C.F.R. § 162.6.

8   At the suppression hearing, the Government suggested that the images on Carpenter's phone were contrary to law because 18 U.S.C. § 1029 prohibits the possession of "fifteen or more devices which are counterfeit or unauthorized access devices." 18 U.S.C. § 1029(a)(3).

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.